UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:09-CV-229-FTM-29SPC

SECURITIES AND EXCHANGE COMMISSION,

   Plaintiff,

vs.

FOUNDING PARTNERS CAPITAL MANAGEMENT
and WILLIAM L. GUNLICKS,

   Defendants,

FOUNDING PARTNERS STABLE-VALUE FUND, LP,
FOUNDING PARTNERS STABLE-VALUE FUND II, LP,
FOUNDING PARTNERS GLOBAL FUND, LTD., and
FOUNDING PARTNERS HYBRID-VALUE FUND, LP,

   Relief Defendants.

_____/

## RECEIVER'S FIRST REPORT

   Daniel S. Newman, as Court-appointed Receiver (the "Receiver") for defendant

Founding Partners Capital Management Company and relief defendants Founding

Partners Stable-Value Fund, L.P.; Founding Partners Stable-Value Fund II, L.P.;

Founding Partners Global Fund, Ltd.; and Founding Partners Hybrid-Value Fund, L.P.

(collectively, the "Receivership Entities"), respectfully files his First Report.

### I.  INTRODUCTION

   On April 20, 2009, the United States Securities and Exchange Commission filed

its complaint ("SEC Action") against Founding Partners Capital Management Company

("Founding Partners") and William L. Gunlicks ("Gunlicks"), alleging that Founding

Partners and Gunlicks had engaged, and were engaging in, a scheme to defraud investors

**BROAD and CASSEL**

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

and violate the federal securities laws. (D.E. 1).    In the Complaint, the SEC sought, among other relief, entry of a temporary retraining order and a preliminary injunction. After reviewing the SEC's submission, on April 20, 2009, Judge John E. Steele of the United States District Court for the Middle District of Florida entered an Order Freezing Assets of Founding Partners and Gunlicks (the "Asset Freeze Order"). The Asset Freeze Order also applies to Founding Partners Stable-Value Fund, L.P., ("Stable-Value"), Founding Partners Stable-Value Fund II, L.P. ("Stable-Value II"), Founding Partners Global Fund, Ltd., ("Global Fund") and Founding Partners Hybrid-Value Fund, L.P. ("Hybrid-Value") (collectively, "Founding Partners Funds").

On April 20, 2009, Judge Steele also entered an order (the "Initial Receivership Order") appointing a receiver (the "Initial Receiver") for Founding Partners and the Founding Partners Funds (collectively, the "Receivership Entities"). (D.E. 9). The Initial Receiver was subsequently removed by Court Order on May 13, 2009. (D.E. 70). Daniel S. Newman, Esq. (the "Receiver"), was appointed Replacement Receiver by Court Order on May 20, 2009 (the "Receivership Order"), which Order supersedes the Initial Receivership Order. (D.E. 73). The Receivership Order provides that the Receiver shall, among other things:

(a) Take immediate possession of all property, assets and estates of every kind of Founding Partners and each of the Founding Partners Relief Defendants, whatsoever and wheresoever located, including but not limited to all offices maintained by Founding Partners and the Founding Partners Relief Defendants, rights of action, books, papers, data processing records, evidences of debt, bank accounts, savings accounts, certificates of deposit, stocks, bonds, debentures and other securities, mortgages, furniture, fixtures, office supplies and equipment, and all real property of Founding Partners and the Founding Partners Relief Defendants wherever situated, and to

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

2 of 28

FMS - 00911

administer such assets as is required in order to comply with the directions contained in this Order... ; and

(b)    Investigate the manner in which the affairs of Founding Partners and the Founding Partners Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of Founding Partners or the Founding Partners Relief Defendants and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred money or other proceeds directly or indirectly traceable from investors in Founding Partners and the Founding Partners Relief Defendants...

This Report summarizes the Receiver's activities and those of his retained professionals between May 20, 2009, and September 30, 2009.

## II.    BACKGROUND

### A.    Appointment of the Receiver and Retention of Professionals

On his appointment, the Receiver met with the Initial Receiver in order to effectuate a smooth transition. The Receiver retained the law firm of Broad and Cassel to serve as Receiver's counsel. The Receiver also retained Berkowitz Dick Pollack & Brant Certified Public Accountants & Consultants, LLP (the "Berkowitz Firm"). The Berkowitz Firm assists the Receiver and his counsel in various capacities, including providing forensic accounting services to assist in locating and recovering the Receivership Entities' asserts, in analyzing their books and records, in preparing the tax return filings required to be filed by the Receivership Entities in accordance with applicable tax laws and in assisting the Receiver's counsel in litigation. The Receiver retained all of these professionals with Court approval and at discounted rates to

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

3 of 28

FMS - 00912

minimize the impact the fees of the retained professionals will have on the Receivership Entities' assets.

### B.    Securing the Offices

The Initial Receiver secured the Founding Partners Naples office ("Naples Office") located at 5150 N. Tamiami Trail, Suite 400, Naples, Florida, on April 20, 2009. The Naples Office consisted of approximately 2,345 square feet. The Founding Partners Chicago office ("Chicago Office") was located at 29 N. Wacker Drive, Suite 2240, Chicago, Illinois and consisted of approximately 2,886 square feet. The Initial Receiver also secured the Chicago Office on April 20, 2009.

The computers at both locations were secured from outside access and information technology experts assisted with the preservation of the computer data at these offices by imaging the hard drives of the computers located in the offices to preserve critical evidence. The Initial Receiver also had inventories of documents, furniture, and equipment created at the time she took control of the offices.[1] Mail was initially directed through the landlord's offices, and the Receiver has subsequently had all mail redirected to the Receiver's office. Similarly, the Receiver has set up a designated phone line to receive all calls to the former Founding Partners offices.

Most of Founding Partners' paper files were maintained in the Naples Office, which had served as the main office of Founding Partners; however, information obtained by the Receiver indicates that Gunlicks had planned to move the main operations from

---

[1] The Receiver would like to acknowledge the efforts of the Initial Receiver. The efforts undertaken by the Initial Receiver and those assisting her to secure the offices and begin the investigation and marshalling process were done in a highly professional and effective manner. Those efforts allowed for a smooth transition. Further, the Initial Receiver made herself available to the Receiver during this process on an unlimited basis, which assistance has been extremely beneficial to the Receivership Entities.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

4 of 28

FMS - 00913

Naples to Chicago. Gunlicks maintained a personal office in both the Naples and Chicago Offices. Founding Partners' chief financial officer worked in the Naples office, and most of the investor files and financial records were obtained from that location. Among others, Gunlicks' son, William Gunlicks Junior, worked from the Chicago office.

### III.    ASSET IDENTIFICATION AND MITIGATION OF FURTHER LOSSES

The Initial Receiver and the SEC immediately sent correspondence and served copies of the Initial Receivership Order in order to freeze Defendants' assets and prevent dissipation.[2] Thereafter, within days of being appointed, the Receiver's counsel issued additional correspondence and subpoenas to third parties for their records concerning the Receivership Entities in order to freeze any additional assets and prevent dissipation. The correspondence directed that, consistent with the Receivership Order, the Receivership Entities' assets be placed under the control of the Receiver. The Receiver and the Initial Receiver also filed copies of the Receivership Order in jurisdictions where receivership assets were believed to exist to preserve the right to pursue property in those jurisdictions.

The Receiver has continued to identify additional institutions and entities that may be in the possession of Receivership assets or critical information. This process insures that the Receiver obtains complete and accurate records of the Receivership Entities' transactions. Upon receipt, documents produced pursuant to subpoenas or letter requests are being analyzed by the professionals assisting the Receiver.

The Receiver has begun the process of identifying all investors as well as trade creditors, such as electric utilities and telephone service providers. Many of the investors

---

[2] These quick efforts were extremely beneficial to the Receivership Entities.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

5 of 28

FMS - 00914

are identifiable from the Receivership Entities books and records. Indeed, the Receiver or those assisting him routinely speak with investors in an attempt to respond to any inquiries they have. The Receiver also established a website (www.foundingpartners-receivership.com) to update investors about developments in the Receivership, including Court filings, and established a toll-free number (877) 373-9479 to handle investor calls.

### A.    The Bank Accounts

Upon entry of the Initial Receivership Order, the Initial Receiver and the SEC moved to identify and freeze all funds in known bank accounts. The following accounts were frozen:

Harris Bank

| | |
|---|---|
| Founding Partners Stable-Value Fund, L.P. | $1,722,081.03 |
| Founding Partners Stable-Value Fund II, L.P. | $  621,764.39 |
| Founding Partners Hybrid-Value Fund, L.P. | $  185,579.49 |

Sun Trust

| | |
|---|---|
| Founding Partners Capital Management Company | $  394,027.00 |
| William Gunlicks | $   82,061.09 |

Currently the Receiver holds the following funds:

BNY Mellon

| | |
|---|---|
| Founding Partners Capital Management Company | $    337,651.36 |
| Founding Partners Stable Value Fund, L.P. | $ 1,724,722.12 |
| Founding Partners Stable Value Fund II, L.P. | $    622,110.71 |
| Founding Partners Hybrid-Value Fund L.P. | $    193,367.12 |

The Receiver has disbursed certain funds for rent, for professional services pursuant to Court Order, and for services rendered by vendors contracted by the

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

6 of 28

FMS - 00915

Receiver. The Receiver attaches as Exhibit "A" to this report a Standardized Fund Accounting Report (SFAR) for the period ended September 30, 2009, reflecting the Receiver's receipt and expenditure of funds.

**B.    The Offices**

As noted above, the Receivership Entities maintained the Naples and Chicago Offices. The Receiver and his counsel recognized the fact that maintaining the leases and utilizing the space at the Naples and Chicago Offices would be a burden on the Receivership, as the combined rent was in excess of $14,000 per month. Accordingly, the Receiver vacated the Chicago and Naples Offices on July 16, 2009, and August 7, 2009, respectively. On July 31, 2009, the Receiver filed motions to terminate the leases for the Naples and Chicago Offices. (D.E. 142 and 143).

The landlord for the Naples Office had the original security deposit and could have asserted claims against the Receivership Entities based on damages that it alleged were incurred as a result of the termination of the lease. The Receiver negotiated a settlement with the landlord for the Founding Partners Naples Office and filed a motion for Court approval of that settlement. (D.E. 166). On October 19, 2009, the Court entered an Order approving that settlement. (D.E. 172). The settlement provided that the Receiver would receive a small portion of the remainder of the security deposit then held by the landlord, and the parties would release each other from any further liability. Had the Receiver not reached an agreement, the Naples Office landlord could have pursued substantial claims against the Receivership Entities, which, if successful, would have depleted funds otherwise available for investors. Moreover, the Receiver might have incurred significant litigation expenses in defending such claims. The Receiver is also in

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

7 of 28

FMS - 00916

negotiations with the landlord for the Founding Partners Chicago Office to settle any potential disputes with that landlord.    At present, the Motion to terminate the lease for the Chicago office is pending before the Court.

The vast majority of the furniture and equipment from the Naples Office and the Chicago Office is currently being stored by Michael Moecker & Associates.    As discussed above, all of these items have been inventoried and secured.

### C.    Hybrid Value Fund

The Receiver is currently in the process of examining the nature and value of the investments made for the Hybrid-Value Fund.  Although these investments bore a book value of approximately $13.3 million as of February 28, 2009, it appears these investments may be worth considerably less than reflected on the Hybrid-Value Fund's books and records.  Many of these investments were made in other hedge funds or small startup enterprises.

### IV.    LITIGATIONS

### A.    Stable Value/Sun Litigation

The Receiver is currently seeking recovery of more than $550 million from Sun Capital Healthcare, Inc. ("SCHI"), and Sun Capital, Inc. ("SCI") (collectively the "Sun Entities").  Stable-Value loaned money to the Sun Entities pursuant to two similar credit and security agreements.[3]

---

[3] The two credit and security agreements have been previously filed with the Court as Exhibits A and B of Receiver's Emergency Motion to Expand Powers of Receiver, D.E. 29.

**BROAD and CASSEL**
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

FMS - 00917

### 1.    The Loan to Sun Capital Healthcare

Pursuant to the SCHI Credit and Security Agreement (the "SCHI Agreement"), Stable-Value loaned money to SCHI to purchase Accounts, as that term is defined in the SCHI Agreement, from sellers/providers that provide healthcare services and goods, such as hospitals, clinics, and nursing homes ("Providers"), payable by third party obligors that insure the patients, such as Blue Cross, Medicare, employers, unions, and other private and governmental healthcare insurers.   Under the SCHI Agreement, Stable-Value has a security interest in all of the assets of SCHI, including Accounts that SCHI purchases and the cash proceeds of those Accounts.

Pursuant to a Master Purchase and Sale Agreement (the "SCHI Purchase Agreement"), the Provider offers its Accounts to SCHI, which decides whether or not to buy such Accounts by advancing a certain amount to the Provider.  SCHI collects a discount fee on each purchased Account.   SCHI and the Providers enter into lockbox agreements with SunTrust Bank ("SunTrust") to set up lockbox accounts for collections of the Accounts.

In conjunction with the SCHI Agreement, on July 6, 2000, SCHI, Stable-Value, and SunTrust entered into Master Wholesale Lockbox Deposit and Blocked Account Service Agreement ("SCHI Master Lockbox Agreement").  The SCHI Master Lockbox Agreement sets forth the agreements between the parties with respect to the various bank accounts established pursuant to the SCHI Agreement. The SCHI Agreement permits Stable-Value, upon the event of an SCHI default, to take control of the lockbox accounts.   In the SCHI Master Lockbox Agreement, SCHI directs and authorizes SunTrust, upon notice from Stable-Value, to transfer all collected and available funds in the lockbox accounts each day to Stable-Value's designated bank account, to stop transferring funds and to follow the directions of Stable-Value.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

9 of 28

FMS - 00918

The SCHI Agreement contains numerous restrictions on SCHI's use of loan proceeds and imposes numerous obligations upon SCHI. Among these restrictions, SCHI may only use loan proceeds to purchase "Eligible Accounts" under limited conditions and circumstances as set forth in the Agreement. Contrary to the SCHI Agreement, SCHI has used and continues to use loan advances from Stable-Value and proceeds thereof to purchase Accounts that do not meet all of the parameters of the SCHI Agreement. SCHI has used loan advances from Stable-Value for capital investments in real estate, including hospitals, owned by the SCHI principals. SCHI has also used loan advances from Stable-Value for "working capital advances" to support the hospitals owned by SCHI principals. Further, SCHI has used loan proceeds to purchase purported Accounts that are not "Eligible Accounts" under the SCHI Agreement, including the purchase of so-called DSH (or disproportionate share) Accounts receivables and workman's compensation receivables. Each of these uses of Stable-Value loan proceeds violates the SCHI Agreement.

In the litigation, SCHI does not deny that it has not complied with the written terms of the SCHI Agreement. SCHI's position (as articulated in its pleadings) is that, prior to the appointment of the Initial Receiver and the Receiver, Gunlicks waived or consented to each instance of SCHI's noncompliance with the written terms of the SCHI Agreement. Another of SCHI's claims in this litigation is that Stable-Value allegedly breached the SCHI Agreement in January 2009 and that SCHI is thus relieved of its duties to pay interest under the SCHI Agreement and perform certain other contractual duties. The Receiver believes that this argument is not supported by the facts or by lending laws.

On April 29, 2009, the Initial Receiver delivered a Notice of Default to SCHI pursuant to Section 8 of the SCHI Agreement, which declared the entire principal amount plus accrued

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

10 of 28

FMS - 00919

interest and costs immediately due and payable in accordance with Section 8.2.3 of the SCHI Agreement.   In a letter dated July 7, 2009, the Receiver formally revoked, rescinded, and withdrew any waivers or consents that SCHI claims to have obtained prior to the Receiver's appointment.   SCHI has not paid interest since its interest payment for December 31, 2008, and has not complied with numerous reporting requirements under the Agreement, including failure to provide audited financial statements.   On September 16, 2009, the Receiver sent SCHI a notice of default for failure to pay interest to the Receiver, which notice accelerated the loan and demanded repayment of all principal, interest, and fees due pursuant to the SCHI Agreement. The Receiver continues to send demands for interest and financial reports to the Sun Entities, but the Sun Entities have failed to respond to these demands.

The Receiver believes that SCHI has breached the SCHI Agreement in these and other respects and that SCHI is required, under the SCHI Agreement and its acceleration clause, to immediately pay all outstanding principal and unpaid interest.   As of October 31, 2009, the amount of the outstanding loans owed by SCHI to Stable-Value is approximately $525,969,671, and the accrued interest is approximately $87,617,723.[4]

### 2.      The Loan to Sun Capital, Inc.

On January 24, 2002, SCI entered into a credit and security agreement (the "SCI Agreement") with Stable-Value.   Pursuant to the terms of the SCI Agreement, Stable-Value agreed to lend funds to SCI to purchase Accounts as that term is defined in the SCI Agreement, subject to the terms and conditions of the SCI Agreement. According to the SCI Agreement, SCI was to use loan proceeds from Stable-Value to purchase certain commercial Accounts from

---

[4] The interest is computed using the Overdue Reimbursement Rate in the SCHI Agreement.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

11 of 28

FMS - 00920

sellers ("Sellers"). The SCI Agreement provided Stable-Value with a security interest over all of SCI's assets.

Pursuant to a Master Purchase and Sale Agreement (the "SCI Purchase Agreement") between SCI and each Seller, the Seller offers its Accounts to SCI, which decides whether or not to buy such Accounts by advancing a certain amount to the Seller. SCI collects a discount fee on each Purchased Account. SCI and the Sellers enter into lockbox agreements with SunTrust Bank ("SunTrust") to set up lockbox accounts for collections of the Accounts.

In conjunction with the SCI Agreement, SCI, Stable-Value, and SunTrust entered into Master Wholesale Lockbox Deposit and Blocked Account Service Agreement ("SCI Master Lockbox Agreement"). The SCI Master Lockbox Agreement sets forth the agreements between the parties with respect to the various bank accounts established pursuant to the SCI Agreement. The SCI Agreement permits Stable-Value, upon the event of an SCI default, to take control of the lockbox accounts. In the SCI Master Lockbox Agreement, SCI directs and authorizes SunTrust, upon notice from Stable-Value, to transfer all collected and available funds in the lockbox accounts each day to Stable-Value's designated bank account, to stop transferring funds, and to follow the directions of Stable-Value.

According to the SCI Agreement, SCI was to use loan proceeds from Stable-Value to purchase certain commercial, nonhealthcare Accounts that are owed by third party obligors of the Sellers. SCI has not complied with the terms of the SCI Agreement. For example, SCI used loan proceeds to purchase at least one Seller in default of its Purchase Agreement, borrowed approximately $72 million from SCHI, and otherwise violated the terms and conditions of the SCI Agreement. SCI has not collected discount fees from entities owned or controlled by the

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

12 of 28

FMS - 00921

Sun Principals.  In addition, SCI appears to have been insolvent for years, which is an event of default under the SCI Agreement

SCI has not paid interest since its interest payment for December 31, 2008, and has not complied with numerous reporting requirements under the Agreement.  On April 29, 2009, the Initial Receiver delivered a Notice of Default to SCI pursuant to Section 8 of the SCHI Agreement, which declared the entire principal amount plus accrued interest and costs immediately due and payable in accordance with Section 8.2.3 of the SCI Agreement.  On September 16, 2009, the Receiver sent SCI a notice of default for failure to pay interest to the Receiver, which also accelerated the loan and demanded repayment of all principal, interest, and fees due pursuant to the SCI Agreement.  The Receiver continues to send demands for interest and financial reports to the Sun Entities, but the Sun Entities have failed to respond to these demands.

The Receiver believes that SCI has breached the Agreement in these and other respects, and that SCI is required, under the SCI Agreement and its acceleration clause, to immediately pay all outstanding principal and unpaid interest.   As of October, 31, 2009, the amount of the outstanding loans owed by SCI to Stable-Value is approximately $18,509,647, and the accrued interest is approximately $2,930,755.86.[5]  The principal litigation contentions concerning SCI are similar to those discussed above concerning SCHI.

3.    **The Loan to HLP Properties of Port Arthur, LLC**

On June 28, 2006, HLP, a limited partnership owned by the Sun Principals, entered into a loan and security agreement with Stable-Value (the "HLP Agreement").  Pursuant to the terms of the HLP Agreement, Stable-Value agreed to lend $5 million to HLP under a Promissory Note

---

[5] The interest is computed using the Overdue Reimbursement Rate in the SCI Agreement.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

FMS - 00922

(the "HLP Note") subject to the terms and conditions of the HLP Agreement and the HLP Note. HLP used the loan proceeds to finance the acquisition of a refurbished hospital to be leased and operated by Promise Specialty Hospital of Southeast Texas, a corporation owned by Promise Healthcare, Inc. ("Promise"), which is owned by the Sun Principals. As security for repayment of the loan made pursuant to the HLP Agreement, the Sun Principals pledged to Stable-Value their membership interests in HLP and their stock of Promise. The Maturity Date, as defined in the HLP Note, was extended by written amendment to June 28, 2009.

Pursuant to the terms of the HLP Agreement and the HLP Note, on the Maturity Date, all unpaid principal, interest, charges, and other amounts due under the HLP Agreement and the HLP Note are immediately due and payable. HLP has not paid the amounts due to Stable-Value, and the HLP Note is in default. HLP has not paid principal or interest to the Receiver. The total principal and accrued interest as of October 31, 2009, equal $5,727,744.00. The HLP Note is secured by a pledge of the Sun Principals' stock in Promise Healthcare and a pledge of their equity interest in HLP. The Receiver currently seeks in litigation to foreclose the pledge of Promise stock, which would result in the Receiver obtaining majority ownership and control of Promise.

### 4.    Negotiations with the Sun Principals

Soon after the appointment of the Receiver, the Receiver was contacted by counsel for the Sun Entities and the Sun Principals, requesting a meeting with the Receiver. At that meeting, the Sun Principals insisted that they had done nothing wrong; that hospitals owned by Promise and by Success Healthcare, LLC ("Success"), both of which are owned and controlled by the Sun Principals, were not incurring operating losses; and there was no need for the Receiver to take any action against the Sun Entities or Promise and Success and their healthcare facilities.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

14 of 28

FMS - 00923

Then Sun Principals also insisted that they would provide immediate, full, and complete voluntary financial disclosure so that the Receiver could see that their representations were truthful.

On the Sun Principals' assurance that they were dealing in good faith, the Receiver attempted to work with the Sun Entities to allow them the opportunity to demonstrate that allowing them to continue to utilize the Receivership Entities' cash collateral was in the best interests of the receivership estate and investors.  Despite the assurances and promises by the Sun Entities' counsel and the Sun Principals, the Sun Entities failed for weeks to provide information to the Receiver.

When the Sun Entities ultimately provided some financial information to the Receiver and his professionals, it was incomplete and inadequate to allow the Receiver to test the veracity of the Sun Entities' assurances that Stable-Value's cash collateral was not being dissipated. Accordingly, the Receiver sent the Sun Entities subpoenas and a letter asking why it was necessary to issue subpoenas to obtain information about the Sun Entities, the use of loan proceeds and cash collateral, and the current financial status of the healthcare facilities purchased solely with loan proceeds from Stable-Value.   In that letter, the Receiver urged the Sun Entities to provide such information voluntarily, as previously promised.

Based on the Sun Entities' conduct and their failure to provide meaningful cooperation and financial information as represented, on July 14, 2009, the Receiver filed a lawsuit against the Sun Entities (the "Receiver/Sun Litigation").  (D.E. 1).  On July 15, 2009, the Receiver also exercised the right of Stable-Value to seize the Lockboxes.  Despite the fact that the Receiver felt compelled to take this action, the Receiver remained willing to allow the Sun Entities to prove that they were not dissipating the receivership estate's cash collateral.   At this time, the

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

15 of 28

FMS - 00924

Receiver's counsel wrote to the Sun Entities counsel reviewing the history of the Sun Entities' conduct, and making it clear that the Receiver would consider funding the Sun Entities to permit the hospitals to remain in operation, provided the Sun Entities provide sufficiently detailed information to permit the Receiver to fulfill his duty to determine the status and use of the Receivership Entity's collateral. The Receiver's counsel wrote in that letter:

> It cannot come as a surprise to you that, after 90 days of Receivership, wherein you have failed to provide any current information about the hospitals that the Founding Partners Entities' loan proceeds are funding, that the Receiver, in fulfilling his obligations to the Court, would begin to take action to recover assets for the investors. Without current information from Sun that supports Sun's contention that Sun's operations are truly going concerns and that the hospitals receiving funds that are the Receiver's Collateral are viable entities, the Receiver has no choice but to begin collecting   assets of the receivership estate for repayment to investors.
>
> Nonetheless, as I reiterated in our call and my e-mail last night, the Receiver wants a written proposal with supporting documentation to justify
>
> (a)    any continuing funding of Sun operations,
>
> (b)    Sun's use of the cash proceeds of the Collateral to fund related entities, and
>
> (c)    the continued nonpayment of interest or principal.
>
> If, for example, Sun can provide specific current information showing the Sun hospitals are viable, going concerns and that continued funding of those hospitals with the Receiver's cash collateral will not diminish the collateral available to repay investors, the Receiver will consider such funding if sufficient current financial information supports such a decision on a hospital by hospital basis. This is not possible, however, without a written proposal to do so and without any current reporting or accounting to the Receiver of Sun's continued use of the Receiver's cash collateral.
>
> To the extent there is a critical need for financing today in order to fund the operations of any particular hospital, please provide us immediately with a request and supporting information so that the Receiver can understand the critical nature of the request and why the funding is in the best interests of the Receivership Estate. The Receiver will give

**BROAD and CASSEL**
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

16 of 28

FMS - 00925

immediate and serious consideration to any such request. I am available to you 24 hours a day to receive information and to counsel the Receiver.

We are also available to meet with you immediately to discuss your funding requests and supporting information. If you wish to meet with us this afternoon, Friday, or over the weekend we will be available.

If your clients take unilateral action without first availing themselves of these options, they will be responsible for any further impairment of the Collateral, including the precipitous closure of any Sun-related entity or facility.

After further communications between the Receiver's counsel, the Receiver, and the Sun Entities' counsel, the Sun Entities requested a meeting with the Receiver and his professionals at the Sun Entities' office on Sunday, July 19, 2009. The meeting on July 19th with the Sun Principals and their counsel and financial advisor and the Receiver and his counsel and accountants lasted approximately nine hours.

At the meeting, SCHI, SCI, and LH Acquisition, LLC, entered into an agreement with the Receiver to resolve the immediate issue of Sun Entities' use of the collateral, including cash collections on the Accounts. The Receiver agreed that he would instruct SunTrust to release up to $14,000,000 from the Sun Entities' Lockbox collections frozen by SunTrust as well as from any additional Lockbox collections thereafter through July 26, 2009, to be used by SCHI and SCI to purchase accounts receivable in the ordinary course of their businesses and to release reserves associated with those accounts receivable in the ordinary course of their businesses in exchange for LH Acquisition's granting, within five days of the Agreement, a first mortgage on real property in Shreveport, LA, on which Promise Hospital of Louisiana, Inc., is located and which the Sun Entities stated has unencumbered value of at least $14,000,000. In addition, the Receiver and the Sun Entities agreed to meet on July 26, 2009, to review the collection and use of cash collateral. The parties also agreed to meet no later than two weeks after July 19, 2009, to

**BROAD and CASSEL**
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

FMS - 00926

consider a 13 week operating budget for the Sun Entities' related healthcare facilities. The Sun Entities also agreed to provide full and complete disclosure to assist the Receiver and his professionals to analyze the current information of the Sun Entities and their related healthcare facilities, which included full access to the accounting firm then performing an audit of the Sun Entities.

When the meeting ended, the Receiver's counsel sent a copy of the July 19th agreement to counsel for SunTrust and instructed SunTrust to release up to $14 million to the Sun Entities, as agreed to under the July 19th agreement. SunTrust experienced difficulties in quickly complying with the arrangement negotiated between the Sun Entities and the Receiver. On July 20 and July 21, the Receiver's counsel worked with SunTrust to ensure that the Sun Entities had access to the $14 million. To address these difficulties, the Receiver and SunTrust's counsel devised a plan for a more effective method to timely release funds to the Sun Entities. The Receiver called the Sun Entities' counsel numerous times to discuss this proposed resolution, but his calls were not returned.

On July 22, 2009, the Sun Entities filed a Motion for Temporary Restraining to enjoin the Receiver from maintaining control over the Lockboxes. (D.E. 122). On July 24, 2009, the Court entered the restraining order pending an evidentiary hearing. (D.E. 130). The Court has not yet scheduled the evidentiary hearing. The Receiver has deposed the representatives of SCHI, SCI, Promise, and Success. The Receiver has also propounded document requests and subpoenas for documents to those entities.

**BROAD and CASSEL**
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.   Miami, Florida 33131-1811   305.373.9400

18 of 28

FMS - 00927

**B.**    **Global Fund/Joint Provisional Liquidator Litigation (Bermuda)**

The Receiver was advised at the time of his appointment that HSBC The Bank of Bermuda, located at 6 Front Street, Hamilton, Bermuda, HM11 ("The Bank of Bermuda"), was in possession of in excess of $13 million of investor funds held in the name of Founding Partners Global Fund, Ltd., a Cayman entity ("Global Fund Ltd.") that is one of the Receivership Entities. The Receiver was furnished with a communication from The Bank of Bermuda to the Initial Receiver in which The Bank of Bermuda stated that it would accept the appointment and instructions of the Initial Receiver. Thereafter, The Bank of Bermuda refused to comply with the Orders of this Court and the Receiver's instructions. Indeed, for a period of time, The Bank of Bermuda refused even to respond to the Receiver's letters and e-mails, one of which specifically directed it to transfer the funds to the Receiver in the United States.

On June 19 and 25, 2009, The Bank of Bermuda's attorneys wrote to inform the Receiver that they do not believe The Bank of Bermuda is subject to the jurisdiction of the Florida Court and the Receiver. The Receiver is taking action in the Bermuda Court in order to enforce this Court's Asset Freeze Order and Order Appointing Receiver, which require that all assets of the Receivership Entities be placed under the control of the Receiver.

On April 20, 2009, after this Court's entry of the Initial Order Appointing Receiver, the Asset Freeze Order and the Order Appointing Receiver, several investors, instituted an action in the Grand Court of Cayman to appoint Joint Provisional Liquidators over Founding Partners Global Fund, Inc., a Cayman corporation ("Global Fund Inc."), and the Global Fund Ltd. On June 11, 2009, the Grand Court of Cayman issued an Order appointing Joint Provisional Liquidators, Ian Stokoe and David Walker (the "JPLs") for Global Fund Inc. and Global Fund Ltd.

FMS - 00928

The JPLs have asserted claims against Global Fund Ltd. investor funds held at the Bank of Bermuda. On June 23, 2009 the JPLs instituted a proceeding in Bermuda to release funds held under the name of Global Fund Ltd. styled *In the Matter of the Liquidation of Founding Partners Global Fund Ltd and in the Matter of a Letter of Request of the Grand Court of Cayman dated 16 June 2009*, In the Supreme Court of Bermuda, Commercial Court, 2009: No. 190.

On July 1, 2009, the Receiver sought the approval of this Court to retain the law firm of Attride-Stirling & Woloneicki ("ASW") to represent the Receiver's interest in Bermuda. (D.E. 103). By Order dated July 2, 2009, this Court entered an Order approving the retention of ASW. (D.E. 104).

On July 16, 2009, ASW, on behalf of the Receiver, filed a petition in the Supreme Court of Bermuda "Commercial Court" Civil Jurisdiction to intervene in the Bermuda matter that had been initiated by the JPLs. The Court of Bermuda granted the Receiver's petition to intervene. Thereafter, on July 16, 2009, the Supreme Court of Cayman entered an order allowing the Receiver to file affidavit evidence, including expert evidence of the United States law in connection with the Receiver's rights to funds in Bermuda held under the name of the Global Fund Ltd.

The Bermuda Court is holding a hearing to determine who has rights to the funds held in the name of Global Fund Ltd. held at The Bank of Bermuda. In connection with that hearing, the Receiver received Court permission to retain Professor Jay Westbrook, who has lectured and published extensively in the areas of domestic and cross-border insolvency, to provide the Bermuda Court with expert evidence on United States law in

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

20 of 28

FMS - 00929

the areas of insolvency and Bankruptcy and, if appropriate, international law relating to insolvency.

On October 16, 2009, the Receiver also filed with this Court an Application for Issuance of a Letter of Request. (D.E. 171). The proposed Letter of Request would ask the Bermuda Court to recognize the Receivership Order and assist the Receiver in carrying out his Court-appointed duties. That application is pending before the Court.

The Receiver has been pursuing, and continues to pursue, the parallel course of negotiating with the JPLs in an effort to resolve the matter without the need for litigation and the ensuing costs to the receivership estate. However, to date, those efforts have not resulted in the execution of a formal settlement document. As such, the Receiver has no choice but to continue with the litigation.

Currently, the evidentiary hearing on the disputed issues is anticipated to be set for sometime in December 2009 or January 1010 in Bermuda. The Receiver will advise the Court as additional developments occur.

### C.     Annandale Litigation

On March 25, 2009, prior to the appointment of the Initial Receiver, a group of investors lead by Annandale Partners L.P. ("Annandale") filed an action in the District Court of Dallas County, Texas ("Annandale/Founding Partners") against Founding Partners, Stable-Value, Stable-Value II, and Gunlicks alleging claims for breach of fiduciary duty, breach of contract, negligent misrepresentation, constructive trust, and an accounting. The Receiver has appeared in this litigation in order represent the interests of the Receivership Entities. Recently, the Receiver and counsel for Annandale have agreed to seek a stay of the Annandale/Founding Partners Litigation.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

FMS - 00930

On March 27, 2009, Annandale filed an action ("Annandale/Sun Litigation") against the Sun Entities and Sun Capital Group, Inc., for aiding and abetting Founding Partners' alleged breaches of fiduciary duty to Annandale. On April 27, 2009, the Sun Entities removed the action to federal court, which subsequently remanded the action when the Plaintiffs amended their complaint to add nondiverse plaintiffs to the lawsuit. On July 21, 2009, Annandale amended the complaint, adding as defendants Promise Health Care, Inc., and the Sun Principals. The amended complaint alleges claims against the named defendants for not only aiding and abetting Founding Partners' alleged breach of fiduciary duty but also claims for unjust enrichment, money held and received, fraud, civil conspiracy, tortuous interference with contract, and replevin. On July 27, 2009, the Sun Entities moved to stay the Annandale/Sun Litigation based on the pendency of the SEC Action and the Receiver/Sun Action. By order dated September 30, 2009, the Texas District Court entered an order staying the Annandale/Sun Litigation.

On September 3, 2009, Annandale Partners LP, Annandale Partners II, L.P., Barbara K. Baldwin, Belmont Strategic Income Fund LP, Edward D. Fallin, Jr., Theodore S. Fries, Donald L. Hampton, Kenny Allan Troutt (as Trustee on Behalf of the Kenny Allan Troutt Descendants Trust), and the Rock of Gainesville, Inc., styling themselves the "Investor Interveners," because of their investment in certain Receivership Entities, moved to intervene in the Receiver/Sun Action. (D.E. 30). They alleged they have the right to intervene because of their interest in their funds invested with the Receivership Entities.[6] The Investor Interveners' proposed complaint alleges claims against the

---

[6] Not all the Annandale parities from the Annandale/Sun Litigation are seeking to intervene in the Receiver/Sun Litigation.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

22 of 28

FMS - 00931

defendants that the Receiver has already sued, as well as Success, Peter Baronoff, Howard Koslow, and Lawrence Leder. The claims against these additional defendants allege securities fraud, aiding and abetting securities fraud, common law fraud, and civil conspiracy. The Investor Interveners also asked the Receivership Court to appoint a receiver over SCI, SCHI, and Promise.

The Receiver opposed the intervention because, among other reasons, he believes the Investor Interveners' intervention would prejudice other Receivership Entity investors and cause the Receiver to expend additional resources that would otherwise benefit all investors. (D.E. 70).

## V.    OTHER MATTERS

### A.    Tax Matters

As discussed above, the Receiver hired the Berkowitz firm to assist in forensic accounting and to prepare appropriate tax filings. The Receiver and his professionals are and have been in the process of conducting an investigation of the financial transactions entered into by the Receivership Entities, including those entered into during the 2008 tax year. That investigation includes, among other things, analyzing the information currently existing on the Receivership Entities' books and records, determining their accuracy, and obtaining missing information.

The Receiver tasked his tax professionals with preparing the appropriate tax returns for 2008; however, based on the lack of complete information to date, the Receiver and those professionals working with him concluded that, despite their efforts, they did not have in their possession sufficient accurate and reliable information

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

23 of 28

FMS - 00932

necessary to file complete and accurate tax returns for the Receivership Entities by September 15, 2009.

In light on this situation, the Receiver and his tax advisors have evaluated all options and concluded that the most prudent course of action at this time was to file with the Internal Revenue Service a blank return with a detailed disclosure statement putting the Internal Revenue Service on notice as to why the Receiver was unable to file a complete and accurate tax return by the September 15, 2009 deadline.

Limited Partners (investors) received blank Schedules K-1 with the same disclosure given to the Internal Revenue Service. The Receiver is aware that a blank return is not a valid return for purposes of starting the statute of limitation, but the Receiver and his tax advisors believe that it puts the Internal Revenue Service on notice that a complete and accurate return will be filed as soon as possible. Because the records were not complete, the Receiver advised the investors that Form K-1s would not be completed by the tax filing deadline and advised investors to consult with their tax professionals and, if necessary, to seek extensions of time to file their returns. Similarly and for the same reasons, tax filings for former Receivership Entity employees also would not be timely completed. Those employees were similarly advised to consult with tax professionals and, if necessary, to seek extensions of time to file their tax returns.

**B.    Fees and Costs Incurred by the Receiver's Team**

Of particular importance to the investors is the impact that the Receiver's investigation will have on returns of monies to the investors. The Receiver and his team are especially cognizant of these concerns and are working diligently to maximize the

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

24 of 28

FMS - 00933

amount of monies available to return to investors. As discussed above, all professionals have agreed to work at discounted fee rates.

At this juncture, the Receiver is involved in multiple litigations, only one of which he has initiated.  The Bermuda Litigation, the other litigations described in this Report and actions by parties seeking to intervene in the SEC Action or the Receiver/Sun Litigation have required the Receiver to exert additional time and resources that would otherwise be channeled elsewhere.

### C.    Future Claims Process

Once the parties reach agreement on resolution of the SEC Action or the action is successfully tried in the SEC's favor, the Receiver anticipates establishing a claims process to facilitate return of investor funds.  Although the scope of that process has not yet been determined, in that process, investors will receive proof of claim forms to be completed by a claims deadline date yet to be established.

### D.    Tolling Agreements

The Receiver has entered tolling agreements with one accounting/auditing firm and one law firm that provided services to the Receivership Entities.  The first of those agreements expires at the end of November 2009.  These agreements toll any applicable statutes of limitations that have not run prior to the effective date of such agreements.

### VI.    CONCLUSION

The Receiver will be filing additional reports with the Court to advise the Court of the progress of the Receiver's work and to make recommendations.  The Receiver continues to encourage investors and others who are in possession of information they

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811  305.373.9400

25 of 28

FMS - 00934

believe may assist the Receiver to contact the Receiver or his counsel by calling toll-free

(877) 349-9479.

Respectfully Submitted,

**BROAD AND CASSEL**

One Biscayne Tower, 21st Floor
2 S. Biscayne Boulevard
Miami, FL  33131
Telephone:  (305) 373-9400
Facsimile:   (305) 995-9443


By: s/Jonathan Etra
    Jonathan Etra, Esq.
    Florida Bar No. 0686905
    *Counsel for Receiver*

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

26 of 28

FMS - 00935

## CERTIFICATE OF SERVICE

I hereby certify that on November <u>16,</u> 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive electronically Notices of Electronic Filing.

<u>s/Jonathan Etra</u>
Jonathan Etra, Esq.

**BROAD and CASSEL**

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811  305.373.9400

27 of 28

FMS - 00936

**SERVICE LIST**

**U.S. Securities and Exchange Commission v. Founding Partners Capital
Management, Inc., et al
Case No. 2:09-CV-229-FTM-29SPC
United States District Court, Middle District of Florida**

*C. Ian Anderson, Esq.*
andersonci@sec.gov
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Tel: (305) 982-6317
Fax: (305) 536-4154
*Attorney for Plaintiff*
*U.S. Securities and Exchange Commission*
*Via CM/ECF*

*Paul A. Calli, Esq.*
pcalli@carltonfields.com
*Marissel Descalzo, Esq.*
mdescalzo@carltonfields.com
Carlton Fields, P.A.
100 S.E. 2nd Street,
Suite 4000
Miami, FL 33131
Tel: (305) 530-4065
Fax: (305) 530-0055
*Attorneys for Defendant William L. Gunlicks*
*Via CM/ECF*

4841-6386-9957.1
43125/0001 BF

**BROAD and CASSEL**

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811  305.373.9400

28 of 28

FMS - 00937