UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:09-CV-229-FTM-29SPC

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.

FOUNDING PARTNERS CAPITAL MANAGEMENT
and WILLIAM L. GUNLICKS,

      Defendants,

FOUNDING PARTNERS STABLE-VALUE FUND, LP,
FOUNDING PARTNERS STABLE-VALUE FUND II, LP,
FOUNDING PARTNERS GLOBAL FUND, LTD., and
FOUNDING PARTNERS HYBRID-VALUE FUND, LP,

      Relief Defendants.

_____/

**OPINION AND ORDER
APPROVING RECEIVER'S RECOMMENDATIONS
AND FAIRNESS OF DISTRIBUTION OF FP DESIGNEE INTERESTS
PURSUANT TO SECTION 3(a)(10) OF THE SECURITIES LAWS**

The issues before the Court are: (i) whether to approve the Receiver's recommendations concerning Investor[1] claims; (ii) whether to approve an interim distribution of interests in the FP Designee to approved Claimants[2] pursuant to the Settlement Agreement with the Sun Entities;[3] and (iii) whether the proposed distribution of Founding Partners Designee LLC ("FP Designee")

---

[1]      "Investors" are defined as investors in the Receivership Funds.  The Receiver mailed Proof of Claim Forms to all Investors listed in the books and records of the Receivership Funds.  "Non-Investor Creditors" are trade creditors, *i.e.* law firms and utilities, which did not receive claims process mailings from the Receiver, and which are not entitled to participate in the Settlement Agreement, and are not subject to this Order.  (*Sun Litigation* Doc. #248 at 3).

[2]      Claimants are defined as "Investors" that submitted Proof of Claim Forms.

[3]      The Sun Entities are defined as Sun Capital, Inc.; Sun Capital Healthcare, Inc.; and HLP Properties of Port Arthur, Inc.

membership interests meets the fairness criteria for the Section 3(a)(10) exemption under the securities laws.  Two objections to the Receiver's recommendations were filed, one of which was subsequently withdrawn[4] and the other was recommended for approval[5].  For the reasons set forth below, the Court approves the Receiver's recommendations concerning claims and the interim distribution, and finds that the distribution of FP Designee interests meets the fairness standard for a Section 3(a)(10) exemption from filing a registration statement under the securities laws.

## I.
## Summary

This matter comes before the Court on the Receiver's Motion for Court Approval of: (a) the Receiver's recommendations concerning claims (the proposed "Allowed Amounts"); (b) an interim distribution of interests in the FP Designee;[6] and (c) the Receiver's proposed objection and hearing schedule (the "Receiver's Recommendations").  (Doc. # 395).  Two objections to the Receiver's Recommendations were filed: one by Randy Caligiuri (Doc. #412) and one by Alan Arnold and Elizabeth Arnold (the "Arnolds") (Doc. #411).  The Court hereby grants the Receiver's Recommendations, as modified both in the Receiver's Omnibus Response to Objections (Doc. #417) and by the Receiver's counsel at the fairness hearing on June 10, 2014.

Specifically, the Court: (i) agrees with and adopts the Receiver's recommendations concerning claims of Investor, reflected as Allowed Amounts on Revised Schedule A (Doc. #417-5); (ii) agrees with and adopts the Receiver's recommendations concerning the interim

---

[4] See Docs. ## 424, 425.

[5] See Doc. #417, p. 16.
[6]        The FP Designee is an entity created as a result of the Settlement Agreement between the Receiver and the Sun Entities.

distribution of interests in the FP Designee to approved Investors[7] pursuant to the Settlement Agreement with the Sun Entities, reflected on Revised Schedule B (Doc. #417-6);[8] and (iii) concludes that the proposed distribution of FP Designee membership interests meets the fairness criteria for a Section 3(a)(10) registration exemption under the securities laws.

## II.
## Background

### A.     The Settlement Agreement and FP Designee

Pursuant to the Receivership Order (Doc. #73), on July 14, 2009, the Receiver initiated *Newman v. Sun Capital, Inc., et al.*, Case No. 2:09-cv-445-FtM-229SPC (the "*Sun Litigation*") by filing an ancillary proceeding against the Sun Entities, seeking the recovery of over $500 million, and asserting, among other things, claims arising from the loan agreements between the Founding Partners Stable Value Fund ("Stable Value"), one of the Receivership Funds,[9] and the Sun Entities.  (*Sun Litigation* Doc. #1).

On December 9, 2011, after months of settlement negotiations, the Receiver and Sun Entities filed a Joint Motion for Expedited Approval of the Proposed Procedure to Obtain Court Approval of a Proposed Settlement Transaction (the "Joint Motion").  (*Sun Litigation* Docs. #248-249).

In essence, the Settlement Agreement provided that the ownership interests in the Sun Entities, their factoring companies, hospital companies, and associated real estate holding companies, including Promise Healthcare, Inc. ("Promise") and Success Healthcare LLC

---

[7]     Per the Settlement Agreement and the Court's order approving the same (*Sun Litigation* Doc #308), this interim distribution of interests in the FP Designee is for Investors only.  (*Sun Litigation* Doc. #248 at 3).

[8]     With a single modification to Revised Schedule B recommended by the Receiver at the June 10, 2014 fairness hearing, which is explained herein.

[9]     The Receivership Funds are defined as Stable Value; Founding Partners Stable-Value Fund II, L.P.; Founding Partners Global Fund, Ltd.; and Founding Partners Hybrid-Value Fund, L.P.

("Success"), would be transferred to the FP Designee – a newly formed Delaware limited liability company and a wholly-owned subsidiary of Stable Value – in exchange for releases of Investor and Receiver claims and potential claims (the "Investor Releases").

The Court preliminarily approved the Settlement Agreement on December 27, 2011 (*Sun Litigation* Doc. #255), and set an objection procedure for Investors who opposed the Settlement Agreement. During the objection procedure, three different objections were filed.

The first objection filed was by the Archdiocese of New Orleans, which argued that the Settlement Agreement was unfair based on alleged concerns about restrictions on cooperating with law enforcement and based on the First Amendment. (*Sun Litigation* Doc. #259). The second objection was filed by certain Investors in Hybrid Value, who filed an objection that was really a premature argument about how the Receiver should treat their claims in the Receiver's Recommendations. (*Sun Litigation* Doc. #264). The third and final objection to the Settlement Agreement was filed by Boies Schiller on behalf of a group of Investors representing approximately 1/3 of the investor base measured by estimated net invested capital.[10] *See* (*Sun Litigation* Doc. #260 at 5, 6 n. 6, 13-15).

After the briefing of the objections to the Settlement Agreement, the Court held a fairness hearing on the proposed settlement on March 30, 2012. At the hearing, the Court heard from counsel for the parties, counsel for the objectors, and any other Investors who had concerns about the terms of the settlement. (*Sun Litigation* Doc. #300). Thereafter, the Court entered its May 17, 2012 Opinion and Order (*Sun Litigation* Doc. #304) stating that the Court would approve the Settlement Agreement except for one non-financial provision. The Court suggested a modification of that provision; gave the parties an opportunity to consider such a modification;

---

[10]     The objection filed by the Boies Schiller objectors is discussed in detail *infra* at Section V(B)(4) in the Court's discussion of the fairness factors.

and withheld a final decision pending notification by the parties as to their positions on the proposed modification.  *Id.*

On June 11, 2012, the Receiver and the Sun Entities filed their Joint Motion for Approval of Revised Settlement Agreement and Amendment of May 17 Opinion and Order (*Sun Litigation* Doc. #306), which amended the provision that gave the Court concern.  Given the amendments to the Settlement Agreement described therein and attached thereto, the Court entered its August 28, 2012 Amended Opinion and Order approving the Settlement Agreement (*Sun Litigation* Doc #308).

**B.**      **The Claims Process**

On April 10, 2012, the Receiver filed his Amended Motion for Approval of the Claims Process (the "Claims Motion").  (Doc. #338).  In the Claims Motion, the Receiver, among other things: (1) set forth his proposed claims administration procedure (the "Claims Process") and attached a proposed Proof of Claim Form for Court approval; (2) proposed a Claims Bar Date; and (3) proposed a notice procedure for the Claims Process and Claims Bar Date.

On August 28, 2012, the Court entered its Order Approving the Receiver's Claims Motion (Doc. #349), which adopted the Receiver's proposed Claims Process and set a Claims Bar Date for October 12, 2012, forty-five (45) days later.

On July 10, 2013, the Receiver filed his Recommendations regarding claims.  (Doc. #395).  In his Recommendations, the Receiver reported that he received 218 claims during the claims process.  *Id.*  Of the 218 claims received, the Receiver recommended approval of 156 claims, rejection in full of 32 claims, and rejection in part of 30 claims.  *Id.*  Of the 156 approved claims, 152 submitted Investor Releases and were deemed eligible to receive an interim distribution of interests in the FP Designee, pursuant to the terms of the Settlement Agreement with the Sun Entities.  *Id.*

5

As part of the Receiver's Recommendations, the Receiver proposed an objection procedure.  (Doc. #395 at 15).  The Receiver recommended that Claimants be given forty (40) days from the order setting the objection procedure to respond in writing to the Receiver's Recommendations, and that the Receiver be given forty (40) days thereafter to respond to timely-filed objections.  *Id*.  Finally, the Receiver recommended that the Court set a hearing date to resolve objections and rule on the Receiver's Recommendations, as well as rule on the fairness of the issuance of FP Designee interests pursuant to the Securities Act of 1933, Section 3(a)(10). *Id*.

On March 6, 2014, the Court approved the Receiver's proposed objection procedure (the "Objection Procedure").  (Doc. #409).

Pursuant to the Objection Procedure, Claimants had forty (40) days, until April 15, 2014, to object in writing to the Receiver's Recommendations. Objecting Claimants were required to file their objections with the Court and send their objections to the Receiver at the law office of Broad and Cassel, to be received no later than April 18, 2014.  *Id*. at ¶2(A).  Any Claimant that did not object to the Receiver's Recommendations within the time frame provided under the Objection Procedure irrevocably waived the right to object at a later date.  *Id*. at ¶2(C).

Two objections to the Receiver's Recommendations were filed.

### III.
### The Objections to the Receiver's Recommendations

As noted, only two objections to the Receiver's Recommendations were filed: one by Randy Caligiuri (Doc. #412) and one by the Arnolds (Doc. #411).

### A.     Mr. Caligiuri's Objection

Mr. Caligiuri's letter objection to the Receiver's Recommendations was filed with the Court on April 14, 2014.  (Doc. #412).  In his letter, Mr. Caligiuri explained the history of his

investments in the Receivership Entities, which included an explanation of how his personal funds were invested with The Private Trust Corporation Limited-Trustee (the "PTCLT"), which in turn invested in Global Fund, Inc. ("Global Inc.")  *Id.* at 1.  Mr. Caligiuri admitted that he is not a direct investor in Global Ltd.,[11] but rather is an investor in the PTCLT, which is an investor in Global Inc., which is an investor in Global Ltd.  *Id.*

Mr. Caligiuri stated in his letter that he was objecting to the Receiver's Recommendations because he could not "either agree or disagree with the Receiver's Recommendations Concerning Claims" and because he did not know how his own sub-claim was being treated within the Global Inc. claim.  *Id.*

According to the Receiver, the Joint Official Liquidator ("JOL") for Global Inc., appointed by the Cayman court, was the only person who had the ability to satisfy Mr. Caligiuri's request for additional information.  (Doc. #417 at 12).  The Receiver represented in his response to the objection (*id.*) and at the fairness hearing on June 10, 2014, that upon receipt of this objection, the Receiver put the JOL for Global Inc. and Mr. Caligiuri in contact.

On June 9, 2014, Mr. Caligiuri withdrew his objection.  (Doc #425).  Thus, no further attention to this objection is required.

**B.     The Arnolds' Objection**

The Arnolds' Objection was filed with the Court on April 15, 2014.  (Doc. #411).  The sum and substance of the Arnolds' objection is that that they always intended to execute the Investor Releases necessary for their participation in the Settlement Agreement and that if the Investor Release were not executed and returned to the Receiver, it was an oversight on the

---

[11]     Although it is not the subject of his objection, Mr. Caligiuri also submitted a claim for an investment in Stable Value.  (Doc. #395 at 8, n.11).  The Receiver recommended that Mr. Caligiuri's Stable Value claim (Claimant #159) be rejected for being a Net Redeemer (defined below).  Notably, Mr. Caligiuri did not object to that recommendation.

Arnolds' part.  *Id*. at 3.  The Arnolds submitted late Investor Releases with their objection and requested that the Investor Releases be accepted and that they be permitted to participate in the Settlement Agreement.  *Id*.

The Arnolds also recounted conversations they allege occurred with Berkowitz Pollack Brant ("BPB"), the Receiver's accountants.  *Id*. at 4.  The Arnolds claimed in their objection that BPB purportedly told them that it would forward its findings regarding the Arnolds' claims to the Court "in an effort to remedy the situation."  *Id*.

The Arnolds argued that their late Investor Releases should be accepted by the Court and the Receiver for two reasons: (1) receiverships are equitable in nature and designed to benefit investors; and (2) the Receiver has accepted late claims in the past and recommended their approval by the Court.  *Id*. at 6-8.

The Receiver does not challenge the Arnolds' request to be included in the Settlement Agreement (Doc. #417).  However, the Receiver does disagree with the Arnolds' characterization of the facts; specifically, the Receiver contends that the Arnolds' failure to execute the Investor Releases necessary for participation in the Settlement Agreement was intentional, and that the Mr. Arnold's description of his conversations with BPB are inaccurate.  *Id*. at 13-15.

Nonetheless, as the Receiver agrees with the Arnolds' request and believes that acceptance of the Arnolds' two Investor Releases is in the best interests of the Investors as a whole, the Court accepts the Investor Releases and will allow the Arnolds to participate in the Settlement Agreement.[12]

---

[12]     It is for this reason that all references in this Opinion and Order are to the Revised Schedules A and B (Docs. #417-5 and 417-6).  The Revised Schedules reflect the Arnolds as Investors participating in the Settlement Agreement with valid Investor Releases, but are otherwise identical to the original schedules attached to the Receiver's Recommendations (Docs. # 395-2 and 395-3).

## C.    Conclusion on Objections

The Court makes the following rulings with respect to the objection filed by Mr. Caligiuri and the objection filed by the Arnolds:

First, the objection filed by Mr. Caligiuri is moot, as it was withdrawn.  (Doc.  #425). Mr. Caligiuri's objection has no effect on the Receiver's Recommendations or the Court's ruling on the Receiver's Recommendations.

Second, the Court upholds the Arnolds' objection, which was a request that their Investor Releases be accepted and they be permitted to participate in the Settlement Agreement.  The Receiver concurs and believes upholding the Arnolds' objection is in the best interests of the Claimants as a whole.

## IV.
## Methodology for Calculating Receiver's Recommended Allowed Amounts

## A.    Net Invested Capital

The Receiver recommended that the Court adopt the Net Invested Capital ("NIC") calculation method for determining each Claimant's Allowed Amount, as opposed to the Net Asset Value ("NAV") that was previously proposed by some Investors.  (Doc. #395 at 26-29). The Receiver indicated in his Recommendations that he considered other calculation methodologies, but ultimately settled on the NIC calculation because of its ease of calculation and because it made the most sense relative to the facts of this case.  *Id.*

The NIC method calculates each Claimant's claim amount by totaling, for each Investor, the amount of cash that was contributed to the fund minus the amount of cash that was received as a distribution from the fund.  As defined by the Ninth Circuit, NIC is "the total amount deposited by [each] claimant with the Receivership Entities less amounts returned to such

9

claimant by the Receivership Entities and less any illegal trading profits reinvested by or credited to such claimant." *CFTC v. Topworth Int'l., Ltd.,* 205 F.3d 1107, 1115 (9th Cir. 1999).

The Receiver ultimately rejected the NAV calculation because it credits some Investors for their fictional account balances, which the Receiver maintains are not a fair representation of the true value of the underlying assets of the Receivership Funds. (Doc. #395 at 27). The Court agrees with the Receiver's recommendation to use the NIC calculation because there was no objection with regard to that decision and, in general, courts have demonstrated a preference for the use of calculations other than NAV in equity receiverships brought about by an underlying fraud. *See SEC v. Amerifirst Funding, Inc.*, No. 3:07-cv-1188-D, 2008 WL 919546, *6 (N.D. Tex. Mar. 13, 2008) (deferring to the receiver's decision to use the NIC calculation method); *CFTC v. Barki, LLC*, No. 3:09-cv-106-MU, 2009 WL 3839389, *1–3 (W.D.N.C. Nov. 12, 2009) (considering multiple calculation methods for distributions and ultimately ruling NIC to be the most equitable); *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) (approving the NIC calculation method recommended by the receiver); and *CFTC v. Walsh*, 712 F.3d 735, 749 (2d Cir. 2013) (A receiver "is not required to apportion assets in conformity with misrepresentations and arbitrary allocations that were made by the defrauder, otherwise, the whim of the defrauder would . . . control[ ] the process that is supposed to unwind the fraud."(internal quotation marks and citations omitted)). No Claimant objected to the NIC calculation used to determine proposed Allowed Amounts.

**B.    Pooling/Consolidation of Receivership Funds**

Second, the Receiver recommended that the Court approve the pooling[13] of the Receivership Funds for purposes of a *pro rata* distribution to Claimants.[14] (Doc. #395 at 18-26).

---

[13]    The Receiver used the term "pooling" and "consolidation" interchangeably.

Equity receiverships are governed by equitable principles. *SEC v. Elliot*, 953 F.2d 1560, 1572 (11th Cir. 1992). As such, the fundamental principal of a receivership distribution plan is that it should be equitable and fair, with similarly-situated investors treated alike. *SEC v. Credit Bancorp, Ltd.*, 99-CIV-11395-RWS, 2000 WL 1752979, *13 (S.D.N.Y. Nov. 29, 2000).

The Receiver suggested, and the Court agrees, that courts may authorize the treatment of various receivership entities as one substantively pooled estate for the purpose of distribution, upon good cause shown. *See SEC v. One Equity Corp.*, 2:08-cv-667, 2011 WL 1002702, *1 (S.D. Ohio Mar. 16, 2011) (permitting pooling of six receivership entities upon good cause shown).

Under the "good cause" test for pooling, courts have examined a number of different factors, including whether: (1) a unified scheme to defraud existed among the receivership entities; (2) the investors across the various receivership entities are similarly situated; and (3) funds were commingled among the receivership entities. *See Amerifirst Funding*, 2008 WL 919546 at *4 (pooling receivership entities because they were all involved in a unified scheme to defraud investors, even where there was no commingling of funds); *Walsh*, 712 F.3d at 749 (upholding district court's finding that investors are similarly situated for purposes of a pro rata distribution plan when they are similarly situated in relationship to the fraud, in relationship to

---

[14]     As the Receiver stated in his Recommendations:

> The alternative to pooling the Receivership Funds is to analyze and calculate each eligible claimant's ownership percentage based only on the specific Receivership Fund with which he/she/it invested. For example, if pooling is not permitted: (i) Stable Value II, Hybrid Value, and Global Ltd. would each receive a distribution from Stable Value, and then Stable Value II, Hybrid Value, and Global Ltd. would have to conduct their own distributions of ownership interests to the individual investors in their respective funds; and (ii) Global Ltd. would receive a distribution of its interest in Hybrid Value, which would then be distributed to the individual investors in Global Ltd., because Global Ltd. invested in Hybrid Value.

(Doc. #395 at 18, n.9).

the losses, in relationship to the fraudsters, and in relationship to the nature of their investments); *CFTC v. Eustace*, No. 05-2973, 2008 WL 471574, *3 (E.D. Penn. Feb. 19, 2008) (approving pooling of assets and *pro rata* distribution in light of evidence of joint marketing of receivership entities and commingling of funds).

### (1)    Unified Scheme to Defraud a Similarly Situated Investor Base

According to the Receiver, the Investors were all victims of false assurances by principal William L. Gunlicks, and the investment opportunities offered by the Receivership Funds were all part of the same overall fraudulent scheme.  (Doc. #395 at 20-21).

To support this claim, the Receiver argued in his Recommendations that: (i) the investment strategies of Stable Value and Stable Value II were predicated on the same fraudulent scheme carried out by Gunlicks, *i.e.* the purported investing of funds under credit and security agreements with the Sun Entities; (ii) Hybrid Value Investors fell victim to the same fraud because Hybrid Value invested approximately 9% of its Investors' funds into Stable Value, and the remainder of Hybrid Value's monies were mostly invested in volatile, illiquid, private companies that were materially different from investments the Hybrid Value memoranda represented were permissible; and (iii) the Global Ltd. Investors fell victim to both the Stable Value and Hybrid Value schemes because Global Ltd. invested the vast majority of its funds into Stable Value, and Global Ltd. also invested in Hybrid Value, enough to make it the largest Investor in Hybrid Value. *Id.*

Based on the foregoing, all Investors were similarly situated and victims of the same fraud – perpetrated by Founding Partners and William Gunlicks – and for that reason, the Receiver recommended that the Claimants should share equally in the pooled assets in accordance with the Receiver's distribution plan.  The Court agrees, based on the Receiver's description of the investments, that there was a unified scheme to defraud Investors.  In addition,

there were no objections from the Investors themselves to the Receiver's argument that that they had all fallen victim to the same scheme.

### (2)   Commingling of Monies

While evidence of commingling is not required for the Court to approve pooling and *pro rata* distribution,[15] the Receiver argued in his Recommendations that there was evidence of comingling, and this fact supports the pooling methodology he and his professionals recommended.  *Id*. at 21-23.

In support of his claim that there is evidence of commingling in the Receivership Funds, the Receiver asserted that: (i) Stable Value II, Hybrid Value, and Global Ltd. all invested monies into Stable Value, which in turn used those monies, and the monies it received directly from its own Investors, to make loans to the Sun Defendants; (ii) Global Ltd. monies were commingled with Hybrid Value monies for the purchase of illiquid private investments unrelated to the *Sun Litigation*; (iii) FPCMC aggregated and commingled monies from all of the Receivership Funds to pay the operating expenses of FPCMC and to provide Gunlicks with reserves to pay himself distributions (in essence, his salary); and (iv) Hybrid Value's investment in Strategic Stable Return Fund (ID), LP ("SSR") and Strategic Stable Return Fund II, LP ("SSR II") (collectively, along with related entities, the "SSR Entities")[16] may have triggered the SSR Entities' investments in Stable Value, constituting an alternative means of distributing funds from Hybrid Value to Stable Value, as further evidence of commingling.  *Id*.

---

[15]     *See Amerifirst*, 2008 WL 919546, at *3 ("[T]he absence of commingling between various receivership entities does not render a pooled, pro rata distribution inequitable.")

[16]     SSR and SSR II are Investors in the Receivership Funds.

Based on the foregoing, the Court agrees that evidence of commingling exists in the Receivership Funds.   There has been no objection to the Receiver's recommendation for a pooled, *pro rata* distribution.

**C.      Conclusion as to Methodology for Calculating Allowed Amounts**

First, the Court finds that the NIC calculation utilized by the Receiver to determine each Claimant's proposed Allowed Amount strikes an appropriate balance between early Investors who earned fictionalized returns on their investments in the Receivership Funds and later Investors who did not.

Second, the Court further finds that a pooled, *pro rata* distribution is appropriate under the circumstances because: (i) a unified scheme to defraud Investors existed; (ii) there is sufficient evidence to demonstrate that monies in the Receivership Funds may have been commingled;[17] (iii) good cause exists to permit pooling; and (iv) the burden of conducting a non-pooled distribution weighs heavily in favor of permitting pooling.

**V.**
**The Receiver's Recommendations Concerning Allowed Amounts**

**A.      Claims Received**

As mentioned above, the Receiver received 218 claims from Investors, including one creditor claim submitted by SSR Capital Partners, LP.[18]   Revised Schedule A identifies, by Claimant number, each Investor that filed a Proof of Claim Form, and also includes the Receiver's recommendation whether each claim should be approved, rejected, or rejected in part, the reasons for proposed rejections, whether each claim included a valid Investor Release

---

[17]      As mentioned, the Court's agreement with and adopting of the Receiver's recommendation for pooling and *pro rata* distribution is not dependent upon or based upon a finding of commingling.  *Amerifirst*, 2008 WL 919546, at *3.

[18]      Although the Receiver did not mail Proof of Claim Forms to Non-Investor Creditors, the Receiver received a claim from SSR Capital Partners LP, a Non-Investor Creditor, evidently because it is an affiliate of Investors SSR and SSR II.

sufficient to establish participation in the Settlement Agreement, the applicable Receivership Fund invested in, the amount claimed in the Proof of Claim Form, the NIC amount per the Receivership Entities' records, and the proposed Allowed Amount.

There have been no objections to the Receiver's recommendations concerning the proposed Allowed Amounts listed in Revised Schedule A (Doc. #417-5), which are as follows:

**(1)      Approved Claims**

Claimants 1 through 156 on Revised Schedule A submitted claims that the Receiver recommended be approved in full.  (Doc. #395 at 9).  Accordingly, the Receiver has listed the full NIC amount of these Investor claims as their Allowed Amounts in column 9 of Revised Schedule A.

The Court agrees with and adopts the Receiver's recommendations concerning Claimants 1 to 156, and approves the proposed Allowed Amounts reflected in column 9 of Revised Schedule A (Doc. 417-5).

**(2)      Rejected Claims**

Claimants 157 to 218 on Revised Schedule A have claims that the Receiver recommended be rejected either in full or in part.  (Doc. #395 at 9).  The Receiver noted in his Recommendations that some claims are objectionable for more than one reason, but did not set out all of the reasons in the Recommendations.  *Id*. at n.10.

**(a)      Rejected in Full**

For Claimants numbered 157 to 166 on Revised Schedule A, the Receiver recommended that these claims be **rejected in full** because using the NIC calculation to determine Allowed Amounts, these Claimants received more in redemptions than they contributed to the Receivership Funds (the Receiver styles these Claimants "Net Redeemers").  *Id*. at 9-10.  As a matter of equity, the Receiver recommended that all Net Redeemer claims be rejected, as Net

15

Redeemers have already recovered more than they invested in the Receivership Funds and should not be permitted to take any portion of a recovery away from Claimants who have not recovered their full investments.  *Id.*

For Claimants numbered 167 to 179 on Revised Schedule A, the Receiver recommended these claims be **rejected in full** because they are duplicative of the claim of the JOL of Global Inc. ("Global Inc.") (Claimant 217), who was appointed by the court in the Cayman Islands to represent all Global Inc. investors.  *Id.* at 10.  The JOL is thus the only person who had standing to make a claim against the Receivership Funds for monies invested in the Receivership Funds through Global Inc., and the Court agrees that Claimants 167 to 179 lack standing to submit claims that are subsumed within the claim of the JOL.

For Claimants numbered 180 and 181 on Revised Schedule A, the Receiver recommended that these claims be **rejected in full** as they are claims from the same entity, which received more in redemptions than it contributed to the Receivership Funds.  .  *Id.*  The Receiver recommended denying both claims, one in Hybrid Value and the other in Stable Value, because the entity received approximately $416,000 more than it invested in Hybrid Value, and invested approximately $126,000 more than it redeemed in Stable Value.  *Id.*  Thus, the entity reflected as Claimant 180 and 181 is in total a Net Redeemer of approximately $290,000 when the Hybrid Value and Stable Value claims are pooled together.

For Claimant number 182 on Revised Schedule A, the Receiver recommended that this claim be **rejected in full** because Claimant 182 was not an Investor in any of the Receivership Funds.  *Id.* at 10-11.  Claimant 182 was contacted by the Receiver's professionals, and agreed with the Receiver's professionals that its claim was filed in error.  *Id.*

For Claimant number 183 on Revised Schedule A, the Receiver recommended that this claim be **rejected in full** because it is a claim on behalf of Global Ltd, which is not an Investor

under the pooling principles applied in the Recommendations, and even if it were, the claim would be  duplicative of the Global Inc. claim.  *Id*. at 11.

Accordingly, Claimants 157 to 183 were not given proposed Allowed Amounts in column 9 of Revised Schedule A, and the Receiver recommended that these claims be rejected in full.  *Id*.  The Court agrees with and adopts the Receiver's recommendations concerning Claimants 157 to 183.

### (b)      Rejected in Part

For Claimants numbered 184, 185, and 186 on Revised Schedule A, the Receiver recommended that these claims be **rejected in part** because all three submitted claims for the same investment.  (Doc. #395 at 11).  The Receiver contacted Claimants 184, 185, and 186, and all three agreed that they should receive equal 1/3 shares of future distributions in connection with their identical claims.  *Id*.  Given these Claimants' agreement, the Receiver recommended that Claimants 184, 185, and 186 each be given a proposed Allowed Amount totaling 1/3 of the sole investment claimed, as reflected in Revised Schedule A.  *Id*.  The Court agrees with and adopts the Receiver's Recommendations regarding these claims, and approves the proposed Allowed Amounts reflected in column 9 of Revised Schedule A (Doc. #417-5).

For Claimants numbered 187 to 207 on Revised Schedule A, the Receiver recommended that these claims be **rejected in part** because the submitted claim amounts did not match the Receivership Entities' books and records.  (Doc. #395 at 11-12).  After reviewing the books and records of the Receivership, as well as the supporting documentation submitted by these Claimants, the Receiver recommended that the NIC amount reflected in the books and records of the Receivership Entities be approved for all twenty-one (21) of these Claimants.  *Id*.  In instances where the discrepancy between the amount claimed and the NIC reflected in the books and records of the Receivership Entities was not readily explainable, the Receiver's professionals

17

contacted those Claimants to seek further explanation from them. *Id.* The contacted Claimants either agreed with the Receiver's analysis that the books and records were accurate or failed to provide support or an explanation for the amounts they claimed on their Proof of Claim Forms. *Id.* Thus, the Receiver recommended that Claimants 187 to 207 each be granted an Allowed Amount totaling the amount reflected on the Receivership Entities' books and records, as reflected in Revised Schedule A. *Id.* There were no objections to the Receiver's recommendations concerning Claimants 187 to 207, thus the Court agrees with and adopts the Receiver's Recommendations regarding these claims, and approves the proposed Allowed Amounts reflected in column 9 of Revised Schedule A (Doc. #417-5).

For Claimant numbered 208 on Revised Schedule A, the Receiver recommended that this claim be **rejected in part** because Claimant 208 has been liquidated and its assets transferred to a liquidating trust. (Doc. #395 at 12). On December 19, 2012, approximately two months after the claims deadline, Claimant 208 submitted a notice of transfer to the liquidating trust, along with the liquidating trust agreement. *Id.* As such, Claimant 208 no longer exists, and the new entity, the liquidating trust, is entitled to the claim formerly belonging to Claimant 208. Thus, the Receiver recommended that Claimant 208's proposed Allowed Amount should be approved for the liquidating trust, as reflected in Revised Schedule A and in footnote 7 thereon. *Id.* The Court agrees with and adopts the Receiver's recommendation concerning Claimant 208, and approves the proposed Allowed Amount reflected in column 9 of Revised Schedule A (Doc. #417-5).

For Claimants numbered 209 to 214 on Revised Schedule A, all six of which submitted Proof of Claim Forms for the same two claims, the Receiver recommended that the claims submitted by Claimants 209 to 212 be **rejected in full**, and the claims submitted by Claimants 213 and 214 be **rejected in part**. (Doc. #395 at 13). According to the Receiver, these six (6) of

18

these claims relate to investments made by SSR and investments made by SSSR II.  *Id.*  After receiving these claims, the Receiver consulted with the SSR Entities and Credit Value Partners, LLC ("CVP"), a non-Claimant entity.  *Id.*  As a result of the discussions between the Receiver, the SSR Entities, and CVP, a letter agreement was entered into and signed by all the SSR Entities and CVP, directing the Receiver to make all distributions, including interim distributions of FP Designee ownership interests, to CVP.  *Id.*  CVP will receive the initial interim distribution of FP Designee ownership interests for these Claimants' overlapping claims.  *Id.*  Thus, the Receiver recommended that Claimants 209 through 212 be rejected, while the proposed Allowed Amounts for Claimants 213 and 214 on Revised Schedule A should be approved for CVP, as further reflected at footnote 8 on Revised Schedule A.  *Id.*  As all involved parties agreed on this recommendation, and there were no objections to the Receiver's recommendation concerning Claimants 209 to 214, the Court agrees with and adopts the Receiver's Recommendations regarding these claims, and approves the proposed Allowed Amounts reflected in column 9 of Revised Schedule A (Doc. #417-5).

For Claimants numbered 215 and 216 on Revised Schedule A, the Receiver recommended that these claims be **rejected in part** because Claimants 215 and 216 received payments, including referral fees and unwarranted bonuses prior to the establishment of the Receivership.  (Doc. #395 at 13-14).  It is the Receiver's position that these payments should be treated as redemptions/offsets against the claims of Claimants numbered 215 and 216.  *Id.*  Therefore, according to the Receiver, Claimants 215 to 216 each have a proposed Allowed Amount that was reduced for the pre-Receivership payments they received, which is reflected in Revised Schedule A.  *Id.*  The Court agrees with and adopts the Receiver's recommendations concerning Claimants 215 and 216, and approves the proposed Allowed Amounts reflected in column 9 of Revised Schedule A (Doc. #417-5).

For Claimant numbered 217 – Global Inc. – on Revised Schedule A, the Receiver recommended that this claim be **rejected in part** because: (i) the claim contained computational errors on Global Inc.'s end; (ii) certain individual investors in Global Inc. received referral fees that should be offset against Global Inc.'s total claim; and (iii) Global Inc.'s claim should be offset by its prior recoveries in Bermuda – defined as the "Bermuda Funds" by the Receiver. (Doc. #395 at 14, 34-39).   Therefore, according to the Receiver, Claimant 217's proposed Allowed Amount was reduced for these reasons, as reflected in Revised Schedule A.  (Doc. #395 at 1).  The Court agrees with and adopts the Receiver's recommendation concerning Claimant 217, and approves the proposed Allowed Amount reflected in column 9 of Revised Schedule A (Doc. #417-5).

> (c)     **SSR Creditor Claim**

For the claim numbered 218 – SSR Capital Partners LP – the Receiver recommended that this creditor claim be **rejected in full**.  (Doc. #395 at 14, 39-40).   Based on the information obtained by the Receiver from SSR Capital Partners LP, and based upon the input of the Receiver's advisors, the Receiver concludes that SSR Capital Partners LP failed to provide sufficient evidence to support its creditor claim.   *Id*.   For these reasons, the Receiver recommended that SSR Capital Partners LP not be given a proposed Allowed Amount in Revised Schedule A.   *Id* at 14.   As there was no objection to this recommendation, the Court agrees with and adopts it.

> **VI.**
> **The Receiver's Recommendations Concerning the Interim Distribution**

In addition to seeking approval of the proposed Allowed Amounts in Revised Schedule A, the Receiver also seeks approval to make an interim distribution of ownership interests in the FP Designee to eligible Claimants in the amount set forth in column 5 of Revised Schedule B.

Revised Schedule B lists all Claimants that: (1) filed a Proof of Claim Form; (2) are either an Approved Claimant or a Rejected Claimant with a claim that should only be partially rejected; and (3) submitted a valid and fully-executed Investor Release.  (Doc. #417-6).  Revised Schedule B includes each eligible Claimant's number, the Receivership Fund invested in, proposed Allowed Amount, and correlating proposed Approved FP Designee Distribution percentage.  *Id.*

The percentages for Approved FP Designee Distributions listed in column 5 of Revised Schedule B were calculated by taking each eligible Claimant's proposed Allowed Amount and dividing it by the total amount of proposed Allowed Amounts.  (Doc. #395 at 15).  For example, Claimant 1 has a proposed Allowed Amount of $7,595,976, which is reflected in column 4 of Revised Schedule B.  (Doc. #417-6).  The total amount of proposed Allowed Amounts for Claimants listed on Revised Schedule B is $385,285,693.  *Id.*  Thus, Claimant 1's proposed Approved FP Designee Distribution is calculated by dividing $7,595,976 by $385,285,693, which rounded to two decimal places equals the 1.97% reflected in column 5 of Revised Schedule B.  *Id.*

Because the Receiver rounded the proposed FP Designee membership percentages to two decimal places, the total percentage of interests to be distributed pursuant to Revised Schedule B totals 100.05%, or .05% more than is possible.  At the June 10 fairness hearing, counsel for the Receiver acknowledged this issue and proposed that the .05% overage be set off against Claimant #156, the largest of the three FPCMC claims recommended to receive a distribution. The Court agrees that this is a sufficient means of handling the .05% overage and does not prejudice any of the Claimants.  As such, the Court further revises Revised Schedule B to reflect a .23% ownership percentage for Claimant #156 as opposed to the .28% ownership percentage reflected in column 5 of Revised Schedule B.  Thus, the Court approves all other percentages as reflected in column 5 of Revised Schedule B.

21

The Court notes that, other than the Arnolds' objection, which was upheld and incorporated in Revised Schedule B, no Claimants objected to the Receiver's Recommendations regarding the distribution of membership interests in the FP Designee.

## VII.
## The Fairness of the Distribution of FP Designee Interests

**A.     Jurisdiction of the Court**

As noted in prior filings (*Sun Litigation*, Doc. #248 at 19, Doc. #395 at 29), the Receiver seeks to issue membership interests in the FP Designee to eligible Claimants pursuant to Section 3(a)(10) of the Securities Act of 1933 (the "Securities Act"). *See* 15 U.S.C. § 77c(a)(10).  Section 3(a)(10) exempts from registration:

> [A]ny security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court . . .

15 U.S.C. § 77c(a)(10).

In accordance with section 3(a)(10) of the Securities Act, the Receiver requested a fairness hearing to be held contemporaneously with the hearing on objections to the Receiver's Recommendations made in this Motion.

The Court has jurisdiction to hold the fairness hearing required by section 3(a)(10) of the Securities Act because it has jurisdiction over the Settlement Agreement entered into between the parties in the *Sun Litigation*, and has already approved the Settlement Agreement as fair. (*Sun Litigation*, Docs. #255, 308); *see also SEC v. Blinder Robinson & Co., Inc.*, 511 F. Supp. 799 (D. Col. 1981) (finding that the Court had jurisdiction to hold a fairness hearing pursuant to

section 3(a)(10) of the Securities Act because it had jurisdiction over the settlement agreement in the SEC's civil enforcement action).

## B.      Fairness Standard

The District Court in *Blinder Robinson* set forth five factors for consideration in determining whether a section 3(a)(10) issuance of exempt securities is "fair": (1) the recommendations of counsel; (2) the scope of discovery; (3) apparent alternatives to the settlement; (4) the nature and volume of responses from those receiving notice of the hearing; and (5) opportunity for direct participation by those who would receive issued securities. *Blinder Robinson*, 511 F. Supp. at 801.

Here, all five factors demonstrate that a section 3(a)(10) issuance of ownership interests in the FP Designee would be fair and weigh heavily in favor of approving the issuance. Indeed, the Court has already analyzed these factors in connection with its finding that the Settlement Agreement itself was a fair and reasonable conclusion to the *Sun Litigation*. (*Sun Litigation* Docs. #205, 308).

### (1)      Recommendations of Counsel

Regarding this factor, the *Blinder* court stated:

> Counsel for the parties to this settlement, as officers of the court, have summarized the negotiating history in their statements at the hearing. Additionally, judicial notice was taken of earlier adversary proceedings in this case. There is nothing to suggest any collusion in the preparation and submission of the agreement. To the contrary, it is apparent that these attorneys have represented the interests of their clients aggressively throughout this case; that the settlement is the product of arms-length bargaining; and that their recommendation that this court accept this agreed resolution of the disputed issues results from their exercise of professional judgment as to what is in the best interests of those for whom they appeared.

*Blinder*, 511 F. Supp. at 801.

The *Blinder* court also found that counsel for the settling parties "represented the interests of their clients aggressively throughout this case," "the settlement [was] the product of arms-length bargaining," and counsel's recommendation "result[ed] from their exercise of professional judgment. *Id*.

The same is true here.  This Court has already opined on the hotly-contested nature of the *Sun Litigation*.  In its Order approving the Settlement Agreement, the Court observed that, "[i]ssues seem to abound, and no issue seems too small to demand close attention."  (*Sun Litigation* Doc. #308 at 26).  The parties could not agree even on who should participate in the settlement negotiations, and the Defendants initially sought to have the Court approve an earlier version of the Settlement Agreement, to which the Receiver had not agreed. (*Sun Litigation* Doc. #244).

In addition, the Settlement Agreement was supported by the SEC and by counsel for the Investor Group,[19] which played a key role in the settlement process and negotiations.

For these reasons, the first factor – recommendations of counsel (and in this case, other important third parties) – favors a finding that the issuance of interests in the FP Designee pursuant to Section 3(a)(10) is fair.

(2)    **Scope of Discovery**

In *Blinder*, the court found that "[t]here ha[d] been time for a complete investigation into the facts in this case and it is apparent that counsel have made full use of discovery procedures."[20]   That is also the case here, as is evident from the court docket in the *Sun*

---

[19]    The Investor Group is also known as the "Investor Steering Committee" and includes a number of Investors that took an active role in the settlement of the *Sun Litigation*.

[20]    However, the *Blinder* Court stated that it was unwilling to examine the discovery record, and noted that it did not ask counsel for its views on the merits of the case.  511 F. Supp. at 801-802.  Here, by contrast, those issues were explored in connection with the Court's approval of the Settlement Agreement.  (*Sun Litigation* Doc. # 308).

*Litigation*.

The Investors actually received substantial disclosure far beyond normal litigation discovery. The Receiver and the Defendants in the *Sun Litigation* provided the Investors with financial and business information to allow the Investors to make informed decisions about whether to participate in the Settlement Agreement, including:

- Consolidating balance sheets and profit and loss statements for Promise for the years ended December 31, 2008, 2009, 2010 and 2011 (profit and loss only for 2011), as well as interim year to date financial consolidating balance sheets and profit and loss statements through March 2010, April 2010 (profit and loss only), May 2010, June, 2010, July 2010, August 2010, September 2010, November 2010, February 2011, March 2011, April 2011, May 2011 (profit and loss only), June 2011, August 2011;

- Consolidating balance sheets and profit and loss statements for Success for the years ended December 31, 2009, 2010 and 2011 as well as interim year to date financial consolidating balance sheets and profit and loss statements through March 2010, May 2010, June 2010, September 2010, February 2011, March 2011, April 2011, May 2011 (profit and loss only), July 2011 and August 2011;

- Promise budgets for 2008, 2009, 2010 and 2011;

- Promise cash flow budgets for 2011;

- Monthly Operating Statistics and Census Trends for the Promise Hospitals;

- Monthly Operating Statistics and Admission Trends for the Success Hospitals;

- Accounts Receivable Statistics; and

- Certificates of Need in Florida and related studies.

In addition, the Joint Motion for Approval of the Settlement Agreement and its exhibits provided additional information, including information about the terms of the Settlement Agreement, the operating entities at issue, the negotiation process, and nature of the due diligence performed. (*Sun Litigation* Doc. #248). The Joint Motion for Approval of the Settlement Agreement also attached a copy of the proposed Settlement Agreement, an estimated

calculation of value by the Receiver's accounting firm, BPB, and other materials.  (*Sun Litigation*

Docs. #248-4, 289).

Further, investors were given the opportunity to obtain, by providing executed

confidentiality provisions, additional information, including:

- The disclosure statement exhibit to the Settlement Agreement (redacted only to block out the names of the payees);

- Consolidated cash flow statements and financial statements for the health care facilities;

- A post-closing organizational chart;

- Mr. Baronoff's employment agreement;

- The due diligence report by Focus Management Group;

- Audited Financial Statements for Promise; and

- The report of the investment banker, MTS Health.

Viewing all of this information in its totality, the Court has already observed:

> It is a fact of litigation life that no one wants to make a settlement decision until the last tidbit of information has been obtained. It is also a fact of litigation life, however, that by the time all information sought is obtained, the benefits of settlement have long since evaporated.  It is clear to the Court that a tremendous amount of information has been obtained and shared, although clearly not as exhaustive as it will be if the case is not settled.  Further, even if the settlement is rejected and litigation proceeds, not all of the sought by the objectors will necessarily be available.  The Court finds that the information obtained and shared by the Receiver, as summarized at Doc. #229.pp. 16-22, is sufficient to allow the investors to make intelligent decisions as to the Settlement Agreement.

(*Sun Litigation* Doc. #308 at 28).

For these reasons, the second factor – scope of discovery – favors a finding that the

issuance of interests in the FP Designee pursuant to Section 3(a)(10) is fair.

(3)      **Apparent Alternatives to Settlement**

The *Blinder* court's concerns regarding the alternatives to settlement mirror the Court's concerns here.  Namely, both the *Blinder* court and this Court were concerned about the risks of not settling:

> The alternative to this settlement suggested by those who have made objections is a full refund of the public investment. That would require the liquidation of the business entity involved and the result would be only a partial recovery. There is not enough cash for complete restitution. Additionally, there would be no future business activity in developing the hotel-casino and the value of the expenditures made in obtaining regulatory approval and other such capital asset values would be lost. The litigation costs involved in resisting such relief would also be a substantial strain on the resources of the settling defendants, thereby further reducing the value of a recovery if the plaintiff ultimately prevailed.

511 F. Supp. at 802.

Here, the Court first provided its view on the need for settlement in its Order on the Defendants' motion for stay, when it stated:  "This particular case is not typical and literally cries out for a good faith effort at resolution before the only people left standing are the lawyers and other litigation professionals."  (*Sun Litigation* Doc. #202 at 1-1).  The Court also recognized in its approval of the Settlement Agreement advocated by the Receiver that "even a litigation win [for the Receiver] may be simply a pyrrhic victory."  (*Sun Litigation* Doc. #308 at 25).

Finally, after full briefing and a hearing, the Court approved the Settlement Agreement – which was premised on the distribution of membership interests in FP Designee through a Rule 3(a)(10) exemption (*Sun Litigation* Doc. #248 at 3, 19) – as "fair, reasonable, and adequate." (*Sun Litigation* Doc. #308 at 40).

For these reasons, the third factor – apparent alternatives to settlement – favors a finding that the issuance of interests in the FP Designee pursuant to Section 3(a)(10) is fair.

**(4)      Nature and Volume of Objections**

The Court recognizes that, despite early objections, the Settlement Agreement was supported by a majority of the investor base.  (*Sun Litigation* Doc. #279 at 37-38).

The principal investor objection to the Settlement Agreement was filed by Boies Schiller on behalf of a group of Investors representing approximately 1/3 of the investor base, measured by estimated NIC.  Boies Schiller's clients had objected because they wanted, principally:  (i) better settlement terms than what was the proposed or what the Sun Entities were willing to provide; and (ii) updated audited financial statements that did not exist.  (*Sun Litigation* Doc. #260 at 5, 6 n.6, 13-15).  Neither concern suggested that the investors were not on notice of the risks inherent in ownership of membership interests in FP Designee, or that a formal registration was needed.

To the contrary, it is precisely because of the objecting Investors' concerns about the risks inherent in obtaining equity in the entities that they sought better terms and an update to the audit (which was not realistic or warranted as this Court found, *see Sun Litigation* Doc. #308 at 27-28).  As noted, the objecting Investors expected the entities to file for bankruptcy if the *Sun Litigation* was not settled.  (*Sun Litigation* Doc. #300 at 45-46).  Clearly then, these Investors and all others were on notice of the risk of equity ownership.

Finally, all investors were given the chance to "opt out" of the settlement, and preserve their claims, as in *Blinder*.  511 F. Supp. at 801.  As the Court noted in its approval of the Settlement Agreement: rather than accept the Settlement Agreement, "an investor can simply walk away, not sign the Consent or Release, and pursue its own individual claims against defendants, or if the Settlement Agreement is approved, against FP Designee."  (*Sun Litigation* Doc. #308 at 24).  But notwithstanding their objection, all of Boies Schiller's clients "opted in" to

28

obtain equity interests by submitting Investor Releases.[21]   Indeed, over ninety-nine percent of all

investors opted to submit Investor Releases to participate in the Settlement Transaction and

receive equity interests in the FP Designee.

For these reasons, the fourth factor – nature and volume of objections – also favors a

finding that the issuance of interests in the FP Designee pursuant to Section 3(a)(10) is fair.

### (5)    Opportunity for Investor Participation

The *Blinder* court found that this factor was satisfied because:

> There [was] a full and fair opportunity for all affected persons to
> participate directly in the process of obtaining full disclosure of the
> matters involved in this settlement agreement. The mailed notices
> gave an accurate and adequate summary of the terms and
> conditions of the settlement. The settlement documents have been
> available for public inspection in the office of the Clerk. No formal
> method of making objections was required. Participation at the
> hearing was invited, without limitation, and the settling defendants
> appeared at the hearing prepared to respond to any relevant
> inquiries and to produce relevant documents.

511 F. Supp. at 802.

Such due process standards were observed in this case, as well.   While the parties were

negotiating the Settlement Agreement, investors that executed Court-approved confidentiality

agreements had access to a data room that was filled with financial and business information.

*See* (*Sun Litigation* Doc. #248 at 19-20; *Sun Litigation* Doc. #279 at 16-17).

In addition, well in advance of the deadline for objections to the Settlement Agreement,

the parties filed and described in detail the proposed Settlement Agreement [(*Sun Litigation* Doc.

---

[21]      In addition, as noted, certain Investors in Hybrid Value filed an objection to the settlement agreement (*Sun Litigation* Doc. #264), which was not actually an objection but a premature argument about how the Receiver should treat their claim in the Receiver's eventual Claims Submission.   Those Investors also "opted in" by submitting Investor Releases.   Those Investors did not file an objection to the Receiver's Claims Submission.

Finally, as noted, an objection to the settlement agreement was filed by the Archdiocese based on alleged concerns about restrictions on cooperating with law enforcement and based on the First Amendment (*Sun Litigation* Doc. #259); that objection was partially overruled.   The Archdiocese "opted out" of the Settlement Agreement by not submitting an Investor Release.   The Archdiocese did not object to the Receiver's Claims Submission.

#248 at 10-18), explaining why they were seeking Court approval.  (*Sun Litigation* Doc. #248 at 3, 19).  The parties also filed, among other things, an estimated calculation of the value of the assets to be transferred, prepared by the Receiver's accounting firm, BPB.  (*Sun Litigation* Doc. #248-4).

Upon the Court's preliminary approval of the Settlement Agreement, the Receiver provided all Investors with a package of additional information, including a notice, the Joint Motion itself, and another confidentiality agreement for the Investors to obtain more due diligence. (*Sun Litigation* Doc. #255).  Those Investors who submitted the proper confidentiality agreements received reports by the professionals who conducted due diligence, an investment banker's report, audited financial statements, and other highly confidential information.  (*Sun Litigation* Doc. #279 at 19-22).

Unlike the *Blinder* Court, here the Court also provided a formal objection procedure.  The Investors were given an opportunity to object, and many did object, to the Settlement Agreement, as noted above.  Investors were permitted to appear at the hearing on the approval of the Settlement Agreement alongside counsel for the parties, all of whom were given a full opportunity to make their arguments and direct pointed questions to the parties and their counsel.

Further, those Investors who are members of the Investor Group (as defined in previous filings) had additional direct participation in the process.

Thus, the Investors – who have been on notice that the Receiver would seek to use the Section 3(a)(10) exemption since at least the Joint Motion for Approval of the Settlement Agreement filed on December 9, 2011 (*Sun Litigation* Doc. #248 at 3, 19) – plainly have had ample opportunity  to directly participate in the process of evaluating the Settlement Agreement, satisfying the fifth and final element of the *Blinder* test.

For these reasons, the fifth factor – opportunity for investor participation – favors a finding that the issuance of interests in the FP Designee pursuant to Section 3(a)(10) is fair.

## VIII.
### Conclusion

Accordingly, it is now

**ORDERED**:

1.      The Caligiuri letter objection (Doc. #412) is deemed **withdrawn**;

2.      The Arnolds' Objection (Doc. #411) is **sustained**.   The Court accepts the Investors' Releases and the Arnolds are permitted to participate in the Settlement Agreement;

3.      The Court agrees with and adopts the proposed Allowed Amounts reflected in Revised Schedule A (Doc. #417-5), which amounts shall serve as the basis for all planned and future distributions to Investors;

4.      Investors, whether they submitted claims or not, are hereby barred: (i) from submitting any further claims upon the Receivership; and (ii) from challenging to the Allowed Amounts reflected in Revised Schedule A (Doc. #417-5);

5.      SSR Capital Partners LP, which is a creditor affiliated with Investors that filed a claim that was rejected in full, is hereby barred: (i) from submitting any further claims upon the Receivership; and (ii) from challenging to the Allowed Amounts reflected in Revised Schedule A (Doc. #417-5);

6.      Those Investors who submitted Investor Releases and are participating in the Settlement Agreement, in accordance with the Investor Releases, are hereby barred from bringing any actions or claims against, among others, the FP Designee, any of the related entities or individuals, including Promise and Success, or the Receivership, Receiver, or any of the

Receiver's professionals, as well as all other entities and individuals identified in the Investor Releases and the Settlement Agreement;

7.      The Court agrees with and adopts the proposed FP Designee membership interest percentages reflected in Revised Schedule A (Doc. #417-6), except that the Court revises Claimant #156's FP Designee interest to .23% to account for the rounding issue raised by the Receiver's counsel at the June 10 fairness hearing;

8.      Claimants are hereby barred from any further challenge to the FP Designee interests reflected in Revised Schedule B (Doc. #417-6);

9.      The Court finds that an interim distribution of FP Designee membership interests pursuant to Section 3(a)(10) of the securities laws is fair, and approves such interim distribution without the need to file a registration statement; and

10.     To effectuate the distribution, within thirty (30) days of the entry of this Order, the FP Designee shall record in its books and records the membership interests reflected in Revised Schedule B, column 5, to the Receiver's Response to Objections (Doc. #417-6), with claimant #156's membership interest modified to .23%, without the need for the filing of a registration statement in accordance with Section 3(a)(10) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(10), and further the FP Designee shall be authorized to bestow such rights upon such members in accordance with Delaware law and its governing documents, as amended and as may be further amended.

          **DONE AND ORDERED** at Fort Myers, Florida, this   3rd   day of July, 2014.

                                        _____
                                        JOHN E. STEELE
                                        UNITED STATES DISTRICT JUDGE

Copies:
Counsel of record

32